UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CHRISTOPHER PHELPS,

                 Petitioner,

                                             CASE NO. 08-12833

v.

                                             PAUL D. BORMAN

MARY BERGHUIS,                           UNITED STATES DISTRICT JUDGE

               Respondent.
_____/

## OPINION AND ORDER DENYING THE
## PETITION FOR WRIT OF HABEAS CORPUS, BUT
## GRANTING IN PART A CERTIFICATE OF APPEALABILITY

Petitioner Christopher Phelps, a state prisoner at the Carson City Correctional Facility in Carson City, Michigan, has filed a petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges an Oakland County conviction for three counts of second-degree criminal sexual conduct, Mich. Comp. Laws § 750.520c(1)(b). Petitioner argues that (1) the trial court's *ex parte* communication with the deliberating jury had a coercive effect on the jury and (2) he was deprived of his right to present evidence when the trial court denied his request to admit in evidence the prior testimony of his deceased wife. For the reasons set forth below, the Court denies the petition.

## I. THE FACTS

Petitioner was charged with three counts of first-degree criminal sexual conduct and three counts of second-degree criminal sexual conduct. The charges arose from allegations that Petitioner repeatedly penetrated and inappropriately touched his stepdaughter ("the complainant") when she was at least thirteen years old, but less than sixteen years old, and a

member of the same household.

The complainant and a male companion named David Torode[1] informed the Southfield Police Department of the abuse on February 12, 2004.  A hearing was held in probate court on July 13, 2004, to determine whether the complainant should be removed from the household due to parental neglect.  The complainant's mother, Shari Phelps[2], testified at the probate court hearing that she was confined to a wheelchair due to a car accident that occurred in 2003.  She testified that the complainant frequently lied and that she did not believe the complainant's allegations about Petitioner.  Because Ms. Phelps died before Petitioner's trial commenced, defense counsel moved to admit Ms. Phelps' probate court testimony under an exception to the hearsay rule.  The trial court denied defense counsel's motion, finding that the hearsay exception did not apply because the child-neglect proceeding was significantly different from the criminal trial.

## A.  Prosecution Witnesses

The complainant testified at trial that Petitioner first touched her vaginal area and breasts when she was thirteen years old.  Petitioner also forced her to touch his penis more than once. He used a vibrator on her and bought her skimpy or see-through clothing, which she was required to wear when he took pictures of her and her girlfriend in sexual positions.  She did not disclose the abuse to her mother because she knew that her mother loved Petitioner and she was afraid that her mother would become angry at her and lose Petitioner if she informed her what

---

[1] Torode is also referred to as David Terreau in the transcript of trial.

[2] Ms. Phelps is referred to as Sherry Phelps in the transcript of trial.  The Court has adopted the spelling used by Petitioner.

2

was happening. Eventually, David Torode took her to the police department where she told the
police what Petitioner had been doing to her. By then, she was sixteen years old.

Police Officer Keith Louden testified that he went to Petitioner's home and took the
initial complaint from David Torode. Detective Sergeant Robert Shelide testified that he and
four other police officers subsequently executed a search warrant at Petitioner's home and
arrested Petitioner. The officers found pornographic material in Petitioner's bedroom and a
vibrator and sexually explicit clothing in the complainant's bedroom. A memory stick from a
camera brought to the police department by David Torode depicted the complainant and her
girlfriend in sexually explicit poses.

Sergeant Shelide explained that he and Detective Darrell Palmer interrogated Petitioner
at the police department. Petitioner initially denied taking sexually explicit photographs of the
complainant and her girlfriend, but he later admitted to taking all the photographs. He also
initially denied engaging in sexual activity with the complainant. He eventually admitted to
performing cunnilingus on the complainant five to eight times. He also admitted to licking her
breast on several occasions, rubbing a vibrator on her genital area, and massaging her genital
area with his fingers. He claimed that this activity began in April of 2003 shortly after his wife
became paralyzed from an accident and when the complainant was fifteen years old. Petitioner
admitted to having approximately twenty sexual contacts with the complainant, and at the
conclusion of the three-hour interview, he stated that the police had treated him fairly and had
been very understanding.

Detective Palmer corroborated Sergeant Shelide's and Officer Louden's testimony. He
also testified that the complainant and David Torode did not disclose their relationship with each

other to the police.

The complainant's friend, Nicole Bowersocks, testified that Petitioner once took pictures of her and the complainant in clothing that he bought for them at a store called Lover's Lane. Petitioner made the girls touch each other and pose in sexual positions while he took the pictures. Before this incident occurred, the complainant confided in Nicole that Petitioner had been sexually assaulting her. Nicole claimed that Petitioner had bought a small vibrator for the complainant and had informed Nicole that he had a special relationship with the complainant.

### B. Defense Witnesses

Retired police officer Herbert Wells testified about the nature of police interrogations and the interrogation techniques that police officers are taught. Luke Devroy testified that he and David Torode lived in Petitioner's home for two or three months before the complainant reported the sexual abuse to the police. He did not see any suspicious activity between Petitioner and the complainant. In fact, Petitioner asked him to keep an eye on the complainant and Torode.

Petitioner testified in his own defense and denied the complainant's allegations. He specifically denied taking photographs of the complainant and touching her inappropriately. He maintained that the complainant was lying about the allegations and that the police psychologically forced him to confess.

### C. The Verdict, Sentence, Appeal, and Habeas Claims

On March 25, 2005, an Oakland County Circuit Court jury convicted Petitioner of three counts of second-degree criminal sexual conduct, but acquitted him of three counts of first-degree criminal conduct. On April 22, 2005, the trial court sentenced Petitioner to concurrent terms of three and a half to fifteen years in prison.

4

Petitioner raised the following issues in an appeal of right:

I.      Did the Trial Court err by authorizing a note to the jury indicating that it
        had "days to go" and to continue to deliberate when they indicated that
        they could not reach a unanimous verdict, and by failing to re-instruct the
        jury or to read a deadlock instruction as requested by the Defense?

II.     Did the Trial Court err by refusing to allow the prior testimony of Shari
        Phelps to be read into the record and by failing to grant a new trial based
        upon its denial to allow the prior testimony to be admitted?

III.    Did the Trial Court err by failing to give the jury an instruction
        regarding identification?

IV.     Did the cumulative effect of all aforementioned errors deny
        Christopher Phelps his due process rights to a fair trial?

On December 5, 2006, the Michigan Court of Appeals affirmed Petitioner's convictions

in a two-to-one decision. *See People v. Phelps*, No. 262367 (Mich. Ct. App. Dec. 5, 2006).

Judge E. Thomas Fitzgerald dissented from the majority's conclusion that Petitioner was not

prejudiced by the trial court's *ex parte* instruction to the jury while the jury was deliberating.

Petitioner raised the same issues, with the exception of the issue about the lack of a jury

instruction on identification, in an application for leave to appeal in the Michigan Supreme

Court. On June 26, 2007, the Michigan Supreme Court denied leave to appeal because it was not

persuaded to review the issues. *People v. Phelps*, 489 Mich. 924 (2007).

Petitioner filed his habeas corpus petition through counsel on July 2, 2008, presenting the

following two substantive claims:

I.      The Michigan circuit and appellate court acted unreasonably in upholding
        Mr. Phelp's conviction. The Michigan jury sent the court a note stating
        that it had reached an impasse On the eve of Good Friday, the court sent
        an *ex parte c*ommunication that the jury "had days to go." The
        instruction was coercive in that [the jury] could have read the instruction
        as saying that [] the court was going to hold the jury for many additional
        days (including Good Friday) before releasing them based on the impasse.

5

II.     The state trial court violated Mr. Phelps's constitutional right to present
        evidence in his defense when it reversed its prior ruling and refused to
        permit [him] to introduce the prior sworn testimony of his late wife (and
        the complainant's mother) which stated that [the complainant] had a
        history of lying and had [a] motive to fabricate the instant story.

Respondent argues in an answer to the petition that these claims lack merit.

## II.  THE STANDARD OF REVIEW

### A.  The AEDPA

Petitioner's claims are reviewed against the standard imposed by 28 U.S.C. § 2254, as

amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (1996).  Section 2254(d) reads:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in
> light of the evidence presented in State court proceedings.

A state court's decision is "contrary to" clearly established federal law if the state court

arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if

the state court decides a case differently than the Supreme Court has on a set of materially

indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable

application" occurs when "a state-court decision unreasonably applies the law of [the Supreme

Court] to the facts of a prisoner's case."  *Id*. at 409.  "[A] federal habeas court may not issue the

writ simply because that court concludes in its independent judgment that the relevant state-court

6

decision applied clearly established federal law erroneously or incorrectly.  Rather, that

application must also be unreasonable." *Id*. at 411.  "A state court's determination that a claim

lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

correctness of the state court's decision." *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770,

786 (2011).  To obtain a writ of habeas corpus, "a state prisoner must show that the state court's

ruling on the claim being presented in federal court was so lacking in justification that there was

an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement." *Id*. at 786-87.

### B.  Petitioner's Constitutional Challenges to the Standard of Review

Petitioner contends that AEDPA's standard of review is unconstitutional because it

violates the doctrine of separation of powers and the Supremacy, Due Process, and Suspension

Clauses of the United States Constitution.

### 1.  Separation of Powers

Petitioner contends that section 2254(d) violates the doctrine of separation of powers.  In

support of this contention, Petitioner relies on *Marbury v. Madison*, 5 U.S. 137, 177 (1803), in

which the Supreme Court stated that it is "the province and duty of the judicial department to say

what the law is."  Petitioner claims that section 2254(d) violates this principle by requiring

federal district courts to ignore binding circuit precedent and by infringing on the power of

district courts to determine what the law is.

While it is true that section 2254(d)(1) requires federal courts to limit its review to a

determination of whether a state court's decision was contrary to, or an unreasonable application

of, clearly established federal law as determined by the Supreme Court, this does not mean that

7

circuit court decisions are never relevant to a habeas case. *Duhaime v. Ducharme*, 200 F.3d 597, 600 (9th Cir. 2000). Circuit court "cases may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help [courts] determine what law is 'clearly established.'" *Id*. Furthermore, no circuit court, on behalf of the entire circuit, has taken the position that AEDPA deference is unconstitutional. *Bonomelli v. Dinwiddie*, 399 F. App'x 384, 387 (10th Cir. 2010). "Thus, there is no debate amongst the circuit courts." *Id*. This Court concludes that section 2254(d) does not violate the doctrine of separation of powers.

## 2.  The Supremacy Clause

Petitioner alleges next that the AEDPA violates the Supremacy Clause of the Constitution. This Clause "demands that state law yield to federal law, but neither federal supremacy nor any other principle of federal law requires that a state court's interpretation of federal law give way to a (lower) federal court's interpretation." *Lockhart v. Fretwell*, 506 U.S. 364, 376 (1993) (Thomas, J., concurring). Because "[s]tate courts are not bound by the dictates of the *lower* federal courts," "a lower federal court's application of Supreme Court precedent is not inherently any more 'right' or 'correct' than that of state courts." *Evans v. Thompson*, 518 F.3d 1, 8 (1st Cir. 2008). "For this reason, [P]etitioner's Supremacy Clause argument is without merit. It is the Supreme Court, and the Supreme Court alone, that has the 'revising authority' to 'control [the state courts'] jarring and discordant judgments, and harmonize them into uniformity.'" *Id*. at 8 n.3 (quoting *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 348 (1816)).

## 3.  The Due Process Clause

Petitioner alleges that AEDPA's standard of review violates the Due Process Clause of the Fourteenth Amendment, but he has not explained how section 2254(d) violates the principle of due process.  To the extent that he is claiming to be deprived of a forum for the vindication of constitutional rights, his claim lacks merit because

> "[t]he Court still has the power to issue the writ, albeit under more tightly circumscribed conditions."  *Perez v. Marshall*, 946 F. Supp. 1521, 1531 (S.D. Cal. 1996), *aff'd*, 121 F.3d 716 (9th Cir. 1997).  In particular, no due process violation can be shown in light of the historical power of Congress and the courts to impose limitations on the scope of habeas relief.  *See Graham v. Johnson*, 168 F.3d 762, 787-88 (5th Cir. 1999) (upholding AEDPA restriction on successive petitions against due process challenge).

*Byrd v. Trombley*, 580 F. Supp.2d 542, 553 (E.D. Mich. 2008), *aff'd.*, 352 F. App'x 6 (6th Cir. 2009).

### 4.  The Suspension Clause

Petitioner's final argument regarding AEDPA's standard of review is that section 2254(d)(1) violates the Suspension Clause, which states that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended unless when in Cases of Rebellion or Invasion the public Safety may require it."  U.S. CONST. art. I § 9, cl.2.  "[J]udgments about the proper scope of the writ [of habeas corpus] are 'normally for Congress to make.'"  *Felker v. Turpin*, 518 U.S. 651, 664 (1996) (quoting *Lonchar v. Thomas*, 517 U.S. 314, 323 (1996)).  Furthermore, "the AEDPA does not suspend the writ; it only requires well–established federal law, as determined by the Supreme Court, before a federal court can reverse a state court decision."  *Houston v. Roe*, 177 F.3d 901, 906 (9th Cir. 1999).

For all the foregoing reasons, the Court rejects Petitioner's challenge to the constitutionality of AEDPA's standard of review.

9

## III.  ANALYSIS OF PETITIONER'S CLAIMS

### A.  The Exclusion of Shari Phelps' Prior Testimony

The Court begins its discussion with Petitioner's claim that he was deprived of his constitutional right to present evidence by the trial court's ruling that he could not admit evidence of his late wife's testimony from the child-neglect proceeding in probate court.  On direct appeal from his convictions, Petitioner raised this issue under Michigan Rule of Evidence 804(b)(1).[3]  Because Petitioner failed to raise his claim as a federal constitutional issue in state court, his claim is unexhausted.  *See Hannah v. Conley*, 49 F.3d 1193, 1196 (6th Cir. 1995) (explaining that "[a] petitioner must 'fairly present' the substance of each of his federal constitutional claims to the state courts . . . ."  The exhaustion doctrine, however, is not a jurisdictional limitation, *Pudelski v. Wilson*, 576 F.3d 595, 606 (6th Cir. 2009), *cert. denied*, __ U.S. __, 130 S. Ct. 3274 (2010), and Petitioner's claim lacks merit.  The Court therefore will excuse the failure to exhaust state remedies for the federal constitutional claim and proceed to address the merits of Petitioner's claim.

---

[3]  The Michigan Court of Appeals determined that the evidence was admissible under Rule 804(b)(1), which reads:

> **(b) Hearsay Exceptions.**  The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

> (1) *Former Testimony*.  Testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

The Michigan Court of Appeals concluded that the trial court did not abuse its discretion in failing to admit the prior testimony, given the nature of the distinct issues involved in the two proceedings.

10

### 1.  Clearly Established Law

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense,'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)), but "[a] defendant's right to present relevant evidence is not unlimited . . . ." *United States v. Scheffer*, 523 U.S. 303, 308 (1998).  Rather, it "is subject to reasonable restrictions." *Id*.

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. . . . [T]he Constitution permits judges to exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.

*Holmes v. South Carolina*, 547 U.S. 319, 326-27 (2006) (quotation marks and citations omitted) (bracket in original).

### 2.  Application

Defense counsel wanted to admit Shari Phelps' prior testimony at Petitioner's trial to show that the complainant did not inform Ms. Phelps of any sexual abuse in the home.  Counsel also wanted to show that, even though Ms. Phelps was present when the abuse occurred, she did not hear or see anything that made her suspicious.  Counsel intended to use the prior testimony to support the defense theory that no sexual abuse occurred.  (Tr. Mar. 22, 2005, at 8-10.)

Although the trial court denied Petitioner's request to admit the prior testimony, Petitioner was able to present evidence showing that the complainant had reasons to lie and that her accusations were untrue.  The complainant testified on direct examination that her mother would have nothing to do with her because her mother thought she was lying.  (Tr. Mar. 21,

11

2005, at 262.)  On cross-examination, defense counsel elicited additional testimony that the complainant's mother did not believe the complainant's allegations about Petitioner and that the complainant had a lot of problems with her mother as a result of her accusations against Petitioner.  The complainant admitted that she had been accused of lying about other things and that her mother had threatened to put her in boot camp when she turned sixteen if she did not "shape up."  (*Id*. at 285-87.)

Defense counsel also questioned the complainant about her relationship with David Torode and the fact that Petitioner had denied Torode's request for permission to date the complainant.  (*Id*. at 267.)  The complainant admitted that the camera and memory stick provided to the police belonged to Torode (*id*. at 270) and that she never disclosed the abuse to her counselors or teachers.  She even told people that Petitioner was a great parent and that she wanted to live with him.  (*Id*. at 276-77.)

Petitioner also testified in support of his theory that there was no abuse and that the accusations against him were fabricated.  He claimed that the complainant and his wife Shari fought constantly and that the police made him say the things that he wrote in his confession because he was an easy target and because it was easier for the police to blame him than to determine whether David Torode was the real abuser.  (Tr. Mar. 22, 2005, at 48, 50, 77.)

The trial court's decision to exclude Shari Phelps' testimony did not prevent Petitioner from presenting a complete defense.  Instead, the court merely excluded one piece of cumulative evidence in support of Petitioner's defense.  Therefore, the trial court's ruling did not result in a fundamentally unfair trial, and the Court of Appeals decision upholding that ruling was objectively reasonable.  Petitioner is not entitled to relief on the basis of his claim that the trial

12

court violated his constitutional right to present a defense.

## B.  The Trial Court's *Ex Parte* Note to the Jury

Petitioner alleges that the trial court's *ex parte* communication with the deliberating jury was coercive and violated his constitutional rights to due process, to be present, and to trial by jury.  The basis for this claim is the trial court's supplemental instruction to the jurors when they informed the court that they had not made a unanimous decision.  The court instructed the jurors to keep deliberating and that they had "days to go."

In his state appellate court brief, Petitioner argued that the trial court should have re-instructed the jury or read the standard jury instruction on deadlocked juries.  Petitioner maintained that he was denied his right to fair and impartial deliberations under the Federal Constitution.  He cited *Rushen v. Spain*, 464 U.S. 114 (1983), in which the Supreme Court determined that an *ex parte* communication between a trial court and juror can be harmless error. Without actually deciding the issue, the Supreme Court assumed in *Rushen v. Spain* that the prisoner's constitutional right to presence and to counsel were implicated.  *Id*. at 117 n.2.  The Supreme Court also stated that those rights were "fundamental rights of each criminal defendant."  *Id*. at 117.  In light of Petitioner's reliance on *Rushen v. Spain* and on facts well within the mainstream of constitutional law, the Court concludes that Petitioner's constitutional argument is exhausted.  *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).

### 1.  Clearly Established Federal Law

As noted, a defendant in a criminal case has a constitutional right to be present at all critical stages of the trial.  *Rushen v. Spain*, 464 U.S. at 117.  Re-instruction of the jury is a

critical stage of trial.  *Caver v. Straub*, 349 F.3d 340, 348-50 (6th Cir. 2003).

Defendants in criminal cases also are entitled to an uncoerced jury verdict.  *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988).  Review of a habeas petitioner's contention that the jury was improperly coerced requires a court to "consider the supplemental charge given by the trial court 'in its context and under all the circumstances.'"  *Id* . at 237 (quoting *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (*per curiam*)).

## 2.  The Relevant Facts

During *voir dire* on Monday, March 21, 2005, the trial court informed the jurors that their deliberations could take anywhere from five minutes to five days and that the court did not encourage either extreme, but that it had seen both extremes during the court's fourteen years on the bench.  (Tr.  Mar. 21, 2005, at 22-23.)  During its charge to the jury on Tuesday, March 22, 2005, the trial court read the standard jury instruction on reaching a unanimous verdict:

> [W]hen you go to the jury room you should first select a foreperson who should see to it that your discussions go forward in an orderly fashion and that each of you have a chance to be heard.  Your verdict must be unanimous.  Each of you, in other words, must agree on the verdict.  In the jury room you should discuss the case among yourselves, but ultimately each of you will have to make up your own mind.  Any verdict must represent your individual considered judgement.  It's your duty to talk to one another, make every reasonable effort to reach agreement, express your opinions and the reasons for them.  But, keep an open mind as you listen to fellow jurors.  Rethink your opinions and do not hesitate to change your mind if you decide you were wrong.  Try your best to work out your differences.  However, while you should try to reach agreement, none of you should give up your honest opinion about the case just because other jurors disagree or just for the sake of reaching a verdict.  In the end, your vote must be your own and you must vote honestly and in good conscience.

(Tr. Mar. 22, 2005, at 161.)  Immediately before the jurors began their deliberations on the following day (Wednesday, March 23, 2005), the trial court once again stated that the jury's deliberations could take five minutes or five days.  The court added:

14

> I do not encourage either extreme.  As I told you previously, do your best to work
> out your differences.  You'll be deliberating today [Wednesday, March 23, 2005].
> If you're not done by about 4:00, I'll have you recess and have you back
> tomorrow.  Take your time.

(Tr. Mar. 23, 2005, at 4.)

On Thursday, March 24, 2005, at 2:30 p.m., the jurors asked the trial court how they

should proceed because they had not made a unanimous decision.  In the absence of counsel and

Petitioner, the trial court responded, "Keep deliberating, you have days to go."

On Friday morning, March 25, 2005, the trial court informed the prosecutor and

Petitioner's attorney about the jury's note from the previous day and the court's response to the

note.  Defense counsel promptly moved for a mistrial and asked the court to read an *Allen*[4]

instruction to the jury.  The trial court denied both requests.  Also on the morning of March 25,

the trial court informed the jury that it could take the afternoon off and leave for the weekend if

it wished to do so.  March 25 was Good Friday, a religious holiday for some people, but the

---

[4] *Allen v. United States*, 164 U.S. 492 (1896).  The instruction approved in *Allen* informed the jurors that:

> in a large proportion of cases absolute certainty could not be expected; that,
> although the verdict must be the verdict of each individual juror, and not a mere
> acquiescence in the conclusion of his fellows, yet they should examine the
> question submitted with candor, and with a proper regard and deference to the
> opinions of each other; that it was their duty to decide the case if they could
> conscientiously do so; that they should listen, with a disposition to be convinced,
> to each other's arguments; that, if much the larger number were for conviction, a
> dissenting juror should consider whether his doubt was a reasonable one which
> made no impression upon the minds of so many men, equally honest, equally
> intelligent with himself.  If, on the other hand, the majority were for acquittal, the
> minority ought to ask themselves whether they might not reasonably doubt the
> correctness of a judgment which was not concurred in by the majority.

*Id*. at 501.

15

jurors responded that they wished to continue deliberating.  At 3:48 p.m. that afternoon, the

jurors reached a verdict, acquitting Petitioner of the more serious first-degree charges and

convicting him of the second-degree charges.

### 3. Analysis

A simple admonition to "keep deliberating" is not coercive.  *United States v. Figueroa-Encarnacion*, 343 F.3d 23, 32 (1st Cir. 2003); *United States v. Coffman*, 94 F.3d 330, 336 (7th Cir. 1996).  Here, the trial court instructed the jurors that it had "days to go," a phrase that the Court had used before in letting the jury know that deliberations could take five minutes or five days.  Further, the Court had also informed the jurors that they would not be required to deliberate on Good Friday or the weekend.  Thus, because the trial court had already informed the jury two times that jury deliberations could take five minutes or five days, the comment that the jury had "days to go" was nothing new to them, and was not improper.  The fact that the trial court had previously charged the jurors to vote honestly and in good conscience and not to give up their honest opinions about the case for the sake of reaching a verdict was not undercut by the judge's comment after a day and one-half of deliberations.  The fact that the jury reached a split verdict and acquitted Petitioner of the more serious charges indicates that their deliberations were thorough and serious.

This case is not similar to *French v. Jones*, 332 F.3d 430 (6th Cir. 2003), a case in which the jurors informed the trial court *three* times that it was unable to reach a decision. In the instant case, the jury brought the issue of lack of unanimity to the trial judge's attention on *one* occasion.       The Court concludes for the reasons stated above that the trial court's *ex parte* repetition of the phrase "days to go" was not coercive.  To the extent that it was made *ex parte*,

the error was harmless.

## IV.  CONCLUSION

IT IS ORDERED that the petition for writ of habeas corpus is **DENIED**.  The Court, however, will grant Petitioner a certificate of appealability on his claim that the trial court's *ex parte* jury instruction was coercive.  The Court declines to grant a certificate of appealability on Petitioner's claim regarding the exclusion of Shari Phelps' prior testimony, because reasonable jurists would not debate whether that issue should have been resolved differently or whether the issue deserves encouragement to proceed further.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).


S/Paul D. Borman                                          
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  July 12, 2011

### CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on July 12, 2011.


S/Denise Goodine                                          
Case Manager